William Joseph **MILLER** and Colleen A. Miller, for and on Behalf of their minor child: Gage D. **MILLER**, Appellant,

v.

Catherine **PHILLIPS**, CNM, Appellee.

No. S–6930.

Supreme Court of Alaska.

June 12, 1998.

C.R. Kennelly, Stepovich, Kennelly & Stepovich, P.C., Anchorage, for Appellants.

Brewster H. Jamieson and Michael B. King, Lane Powell Spears Lubersky, Anchorage, for Appellee.

Before MATTHEWS, C.J., and COMPTON and BRYNER, JJ.

BRYNER, Justice.

The parents of an injured newborn baby sued their midwife, claiming that she panicked during the delivery and negligently caused the injury. A jury found for the midwife. On appeal, the parents claim that the midwife's supervising physician should have been barred from testifying as an expert because he was called only as a fact witness; that testimony concerning the midwife's prior lack of panic should have been excluded as inadmissible character evidence; and that the jury should have been instructed to presume that the midwife's delivery-room notes were correct and accurate. We hold that the physician was entitled to express expert opinions formed as a supervisory participant; that evidence of the midwife's lack of prior panic was admissible to prove her ability to cope with panic situations; and that the jury could properly decide for itself if the delivery-room notes were complete and accurate.

## I. FACTS AND PROCEEDINGS

Gage Miller was born to William and Colleen Miller on December 12, 1991, at Alaska Regional Hospital[1] (ARH) in Anchorage. Catherine Phillips, a certified nurse midwife, was responsible for Colleen Miller's prenatal care and performed Gage's delivery.

ARH policy required each midwife to be assigned to a "preceptor," or supervising obstetrician/gynecologist. Dr. Burritt Newton

---

1. Alaska Regional Hospital was known as Humana Hospital at the time.

was Phillips's preceptor; in that capacity, he monitored Colleen Miller's prenatal care records for potential problems with the pregnancy, approved her for continuing midwife care by Phillips, acted as Miller's formal admitting physician at the time of childbirth, consulted with Phillips during the delivery, and reviewed and signed off on Phillips's delivery-room notes and Miller's medical chart. However, Dr. Newton was not present at the time of birth and never personally met or treated Colleen Miller.

Most of Colleen Miller's labor and delivery progressed normally. About thirteen minutes before birth, however, Gage Miller's fetal heart rate slowed, a phenomenon called fetal bradycardia. A minute or two before birth, one of Gage's shoulders lodged against and became obstructed by his mother's pubic bone, a complication known as shoulder dystocia. At birth, Gage was found to have "Erb's palsy," a permanent injury caused by damage to nerve roots at the cervical spine; this injury will greatly limit Gage's use of his right arm.

In July 1992 William and Colleen Miller filed suit on behalf of Gage alleging that Phillips, Dr. Newton, and ARH were negligent in their handling of Gage's delivery. An expert advisory panel investigated the allegation and concluded that Gage's injury probably resulted from birth trauma caused by traction on the fetal head after Gage's shoulder became impacted. However, the panel also found that the handling of Gage's birth was "appropriate," that his injury was not caused by "unskillful care," and that without intervention Gage's shoulder dystocia could have resulted in neurological impairment or fetal death.

ARH moved for and was granted summary judgment. The Millers eventually stipulated to Dr. Newton's dismissal. The case proceeded to trial against Phillips. At trial, the Millers' primary theory of negligence was that Phillips was under pressure to act quickly because of Gage's bradycardia (his slowed heart rate), that she panicked upon realizing that Gage's shoulder had become lodged against his mother's pubic bone, and that, acting out of panic, she pulled and twisted Gage's head in an effort to speed his birth.

In support of this theory, William Miller—Gage's father—and Kim McMichael—a family friend who had accompanied the Millers in the hospital delivery room—both testified that Phillips became panicky after the onset of Gage's bradycardia and the discovery of his shoulder dystocia; they described her as continuously and forcefully pulling, tugging, and rotating Gage's head until his delivery ended. The Millers also relied on Phillips's delivery-room notes, which contained only a brief reference to dystocia, indicating that "mild shoulder dystocia" had been relieved "by traction only." According to the Millers, this note established that Phillips had dislodged Gage's shoulder by pulling on his head. The Millers presented one expert witness, Dr. James Lundquist, who testified that Phillips's use of traction on Gage's head fell below the standard of care applied to nurse midwives in that situation.

The Millers also called Phillips as a hostile witness. They questioned her about her delivery-room notation that Gage's shoulder dystocia had been relieved "by traction only." She explained that "traction," as used in her notes, was a form of medical jargon indicating a directional guiding, as opposed to a pulling force. According to Phillips, her notation that dystocia was relieved by traction merely indicated the use of certain techniques "implicit in the management of shoulder dystocia." Phillips described how these techniques were actually used in Gage's case. When asked if Gage's delivery had been "a panic situation," Phillips adamantly denied having panicked.

Expert witnesses later presented by Phillips testified that her actions in relieving Gage's shoulder dystocia fell within the standard of reasonable care required of a certified nurse midwife. The jury returned a verdict in favor of Phillips, finding that her handling of the delivery was not negligent.

The Millers appeal on behalf of Gage, alleging that the trial court committed reversible error by admitting objectionable testimony and by improperly instructing the jury.

## II. DISCUSSION

### A. Dr. Newton's Expert Testimony

Although Phillips included her preceptor, Dr. Burritt Newton, on her general witness

list for trial, she did not name him as a potential expert witness. At trial, the Millers objected to any expert testimony by Dr. Newton. In response to this objection, the trial court ruled that Newton, as Phillips's preceptor, had in effect been Colleen Miller's "treating doctor." For this reason, the court deemed Dr. Newton to be a "hybrid" witness, ruling that, while he would be forbidden from testifying in general terms about the appropriate standard of care, he would be allowed to testify as to "his expert observations" and "his own opinion as to what he observed."

The trial court later broadened the scope of its ruling, permitting Dr. Newton to state expert opinions based on his review of hospital records. Several months before trial, while still a defendant in the case, Dr. Newton had filed an affidavit in support of ARH's motion for summary judgment. In this affidavit, Dr. Newton indicated that he had "reviewed the history of this labor and delivery and all pertinent medical records, and based upon [his] knowledge and experience with respect to the matters at issue, [he could] find no fault or shortcoming of any nature with the care, facilities, staffing, or other involvement by the Hospital in relation to the labor and delivery in this matter." The trial court allowed Dr. Newton to testify about these issues, but limited him to the "four corners of [his] affidavit."

**2.** Decisions involving the admissibility of expert testimony are committed to the sound discretion of the trial court and are reviewed only for abuse of discretion. *See Sweet v. Sisters of Providence in Washington,* 895 P.2d 484, 494 n. 10 (Alaska 1995).

**3.** *See, e.g., Stigliano v. Connaught Lab., Inc.,* 140 N.J. 305, 658 A.2d 715, 719 (1995) (holding that as fact witnesses, treating doctors in medical malpractice cases may testify in opinion form about their diagnoses and treatment of patients' disorders, including their determinations of disorders' causes); *Thompson v. KFB Ins. Co.,* 252 Kan. 1010, 850 P.2d 773, 784–85 (1993) ("A 'person expected to be called as an expert witness' typically would be a consultant whose connection with the case began during trial preparation rather than with the events upon which plaintiff's claim is based.... A treating doctor, while certainly possessing special knowledge, skill, experience, and training required of a witness testifying as an expert, typically would be called principally to recount plaintiff's injury and

██ The Millers contend that the trial court erred in allowing Dr. Newton to testify as an expert.[2] They point to numerous items of expert testimony that, in their view, should have been excluded. We do not find this argument persuasive. When physicians are called to testify about matters pertaining to the treatment of their patients, the distinction between an expert witness and a fact witness inevitably becomes blurred. Courts in other jurisdictions have often recognized that treating physicians need not be listed as expert witnesses on pretrial disclosure lists, even when their proposed testimony involves opinions regarding their patients' injuries, treatment, and prognoses.[3]

The Millers nevertheless contend that Dr. Newton was not Colleen Miller's treating physician because he had no personal contact with her prior to or during her son's delivery. This argument lacks merit. While Dr. Newton did not provide prenatal care for Colleen Miller or perform Gage's delivery, he acted as Phillips's supervising physician. In that capacity, he reviewed Colleen Miller's medical chart with Phillips when Miller was approximately eight months pregnant, in order to determine if it would be appropriate to continue midwife care or if Miller needed an obstetrician's care. Pursuant to ARH policy, Dr. Newton was responsible for Colleen Miller's admission to the hospital at the time of Gage's birth and was listed as her admitting physician. As Colleen Miller's admitting

treatment."); *see also Huntley v. Foster,* 35 Cal. App.4th 753, 41 Cal.Rptr.2d 358, 360 (1995); *Beck v. Albany Med. Ctr. Hosp.,* 191 A.D.2d 854, 594 N.Y.S.2d 844, 846 (N.Y.App.Div.1993). Other cases hold that a treating physician need be listed as an expert only when called upon to testify generally about the prevailing standard of care. *See Plunkett v. Spaulding,* 52 Cal.App.4th 114, 60 Cal.Rptr.2d 377, 387 (Cal.App.1997) (holding that where a treating doctor is called to give an expert opinion on the standard of care, that doctor is properly labeled an expert witness and must be disclosed to the other party along with other experts); *Turner v. Duke Univ.,* 325 N.C. 152, 381 S.E.2d 706, 716 (1989) ("Where a doctor is or was the plaintiff's treating physician and is called to testify *not* about the standard of the plaintiff's care but rather about the plaintiff's treatment and the doctor's choice of surgical procedures, he is not an expert witness.") (emphasis added).

physician, Dr. Newton was "automatically the one responsible for seeing that the medical record [was] complete." He was available for consultation with Phillips—and actually did consult with her—during Colleen's labor and Gage's birth. He was also expected to perform the delivery itself if Phillips encountered difficulties requiring a physician's intervention. Dr. Newton co-signed all of Phillips's notes in the record and reviewed her medical chart approximately a month after Gage's delivery.

Thus, Dr. Newton was involved intimately in the events surrounding Gage's birth. The nature of his involvement required him to bring his medical expertise to bear on the facts within his knowledge. Furthermore, both in his supervisory capacity over Phillips and in his own capacity as a defendant in the Millers' lawsuit, Dr. Newton remained engaged in the post-birth process of evaluating the medical treatment received by Colleen and Gage. Given these circumstances, it makes little difference whether Dr. Newton functioned as a "treating physician" or a "preceptor."

■ The Millers complain that Phillips's failure to list Dr. Newton as an expert caused them unfair surprise. Although we recognize that pretrial disclosure of expert witnesses can serve the purpose of eliminating surprise,[4] the record in the present case does not support the Millers' claim. The Millers knew that Dr. Newton would testify at trial, and they had ample advance notice of the substance of his opinions. Well before trial, they had received a copy of his affida-vit. After receiving the affidavit, the Millers conducted a deposition of Dr. Newton but elected not to question him about his assessment of Phillips's performance. At trial, after the court ruled that Dr. Newton could state his opinion, the court offered the Millers a forty-five minute recess to interview the doctor before he testified. They declined. Dr. Newton's testimony itself was hardly surprising: it conformed to the opinions stated in his pretrial affidavit and was largely cumulative of testimony offered by Phillips's other expert witnesses.[5]

The Millers' claim of surprise is thus unconvincing. We conclude that the trial court did not abuse its discretion in allowing Dr. Newton to express his opinions.[6]

### B. Evidence of Phillips's Lack of Prior Panic

An integral part of the Millers' theory at trial was that Phillips panicked during Gage's delivery and mishandled the baby. The Millers called Phillips as a hostile witness and questioned her on the topic. Phillips denied having panicked. The Millers countered this testimony with testimony from several witnesses who claimed that Phillips had become excited and upset and had started yelling when the shoulder dystocia occurred.

As part of her response to the Millers' evidence, Phillips asked to present evidence that she had not panicked during other deliveries. The trial court granted the request, ruling that the Millers had opened the door to inquiry on this issue.[7] Several of Phillips's

---

4. See, e.g., Tzystuck v. Chicago Transit Auth., 124 Ill.2d 226, 124 Ill.Dec. 544, 529 N.E.2d 525 (1988); Holston v. Sisters of the Third Order of Saint Francis, 247 Ill.App.3d 985, 187 Ill.Dec. 743, 618 N.E.2d 334, 343 (1993).

5. Phillips presented testimony as to the standard of care from several experts: the Medical Advisory Panel; Dr. Raymond Jennett, an obstetrician/gynecologist; Carol Verga, a certified nurse midwife; and Phillips herself. All of these experts opined that Phillips's actions to relieve Gage's shoulder dystocia were appropriate and that she did not breach the standard of care.

6. Our decision that the trial court did not abuse its discretion in allowing Dr. Newton to testify as an expert disposes of the Millers' claim that the court erred in giving Jury Instruction 14, which

told the jury that it could consider Dr. Newton's expert testimony. In our view, Instruction 14 was not inaccurate in its description of Dr. Newton's testimony.

7. The trial court said, in relevant part:

I think that plaintiffs have opened the door to [evidence of Phillips's character trait of calmness or patience versus tendency to panic] by [offering] evidence that she was panicking.... I think it's certainly relevant.... To the extent that it's character [evidence,] and I'm not quite sure that it is, but if it is, clearly [Rule] 404(a) does permit it if it's a relevant character trait[,] and I think in this case it is. I think under a [Rule] 403 analysis, it's more probative than prejudicial. It's not particularly prejudicial and again, [to] the extent that the

witnesses, including Dr. Newton and delivery room nurses Lynette Lupes–Warnock and Barbara Leng, thereafter testified about Phillips's handling of other deliveries; all testified that they had never seen Phillips panick or handle babies inappropriately.

■ The Millers contend that the trial court erred in admitting evidence of Phillips's demeanor during other deliveries. They claim that evidence of Phillips's lack of prior panic was character evidence and, as such, was inadmissible under Evidence Rule 404(a).[8]

■ We review a trial court's decision on the admissibility of evidence under the abuse of discretion standard. *See In re D.J.A.*, 793 P.2d 1033, 1035–36 n. 2 (Alaska 1990). In the present case, the trial court's exercise of its discretion to admit the disputed evidence cannot be evaluated without considering the specific evidentiary context in which it occurred.

As already mentioned, the contention that Phillips had panicked was an integral part of the Millers' case. In calling Phillips as their own witness and questioning her about the circumstances surrounding Gage's delivery, the Millers sought to show that, upon discovering Gage's shoulder dystocia, Phillips, already harried because of Gage's slowing heart rate, simply overreacted. At one point, the Millers asked Phillips: "As a matter of fact, weren't you in a panic about saving this child from dying and . . . in a hurry to get [the child] out, and you just got it out as fast as you could, pulling on it?" At various other points, the Millers questioned Phillips's experience in managing shoulder dystocia and her knowledge of the proper techniques for resolving the condition. The Millers asked Phillips to acknowledge that, since Gage's birth, she had "discussed this [case] with your experts on how it's supposed to be done" and had read various books and arti-

cles discussing the proper management of shoulder dystocia. They pressed her to concede that her version of events at trial was inconsistent with the one she had given in her delivery-room notes, where she wrote that she had resolved Gage's dystocia "with traction only."

Throughout this line of questioning, the Millers suggested that Phillips did not know the proper treatment for resolving shoulder dystocia when Gage was born, that she had reviewed the techniques after Gage's delivery, and that she had applied her newfound knowledge to concoct the self-serving, exculpatory version of events she presented at trial. In short, the clear implication of the Millers' questioning was that Phillips's trial testimony was a recent fabrication.

Considering this theory of negligence, the trial court did not err in concluding that the Millers had called into question Phillips's knowledge, experience, and ability to deal with births involving shoulder dystocia; nor did the court abuse its discretion in allowing Phillips to respond by presenting testimony of medical professionals who knew Phillips to have been capable of competently managing such deliveries.

■ Most of the evidence that the Millers now claim was barred under Evidence Rule 404(a) consisted of testimony directly describing Phillips's experience, knowledge, and competency in dealing with dystocia.[9] This was not character evidence.

Both Dr. Newton and Nurse Leng were also briefly questioned about Phillips's demeanor on past occasions and did state that they had never seen her panic. This testimony dealt with Phillips's emotional response and therefore may be viewed more readily as character evidence. It is much like evidence of prior non-negligent behavior that generally is barred when offered to prove that the

---

issue's been raised, it was raised by the plaintiffs. . . .

**8.** Alaska Rule of Evidence 404(a) states, in part: "Evidence of a person's character or a trait of character is not admissible for the purpose of proving that the person acted in conformity therewith on a particular occasion[.]"

**9.** For example, the Millers object to testimony by Dr. Newton that Phillips had called him in to help with deliveries several times over the years when they "would encounter a mild shoulder dystocia, . . . and I would have the chance to see how she managed it[,] and [I] felt comfortable with her knowledge of the maneuvers and her ability to carry those maneuvers out."

actor was not negligent on a particular occasion. *See, e.g.,* McCormick, *Evidence* §§ 188–89 (2d ed.1972). Nonetheless, it was closely tied to testimony describing Phillips's experience, knowledge, and actual performance. The context in which this evidence was presented created little likelihood that the jury would respond to it as character evidence—that is, as proof that Phillips was a person of generally calm disposition and therefore that she did not panic during Gage's birth.

Furthermore, insofar as the lack-of-panic testimony was character evidence, there was justification for its admission as such. The Millers all but invited this testimony when, while questioning Phillips about panic, they asked, "Do you panic on all deliveries?" Moreover, by suggesting that Phillips had panicked during Gage's birth due to her inexperience in managing shoulder dystocia, the Millers necessarily implied that Phillips's inexperience predisposed her to panic in "a panic situation." In essence, the Millers' position was that Phillips's lack of knowledge and experience rendered her incapable of coping with Gage's case and caused her to panic. The evidence concerning lack of prior panic was a fair response to this tacit but unmistakable suggestion that Phillips lacked capacity to cope with "a panic situation."

Finally, to the extent that Dr. Newton's and Nurse Leng's testimony about Phillips's lack of prior panic was inadmissible character evidence, its admission plainly was harmless. The testimony concerning Phillips's demeanor on prior occasions was brief and minimally prejudicial. Virtually identical testimony concerning Phillips's lack of prior panic was given by Nurse Lupes–Warnock; although the Millers objected to Lupes–Warnock's testimony below, on appeal they have not challenged its admission. We find no reasonable likelihood that the admission of Dr. Newton's and Nurse Leng's lack-of-panic testimony had an appreciable effect on the jury's verdict. *See In re D.J.A.,* 793 P.2d 1033, 1035–36 n. 2 (Alaska 1990) (error is harmless if it would have had no probable effect on a reasonable jury's verdict).

*C. Presumption of Completeness and Accuracy*

■ During Gage's delivery, both Phillips and delivery-room nurse Barbara Leng kept notes in Colleen Miller's medical chart. At trial, the Millers contended that Phillips's and Leng's testimony did not conform to their notes; they proposed an instruction that presumed the notes to be accurate and shifted to Phillips the burden of proof as to any facts reflected in the trial testimony that varied from the notes:

> It is the duty of Health Care providers such as Cate Phillips and Nurses working under her to describe accurately and fully in their medical records kept in the course of treatment everything of consequence that was done or observed during the course of treatment.
>
> The medical records kept during the course of the delivery of the child, Gage Miller, in this case are therefore to be accepted by you as accurate and complete. To the extent that you are asked to interpret the records differently from the manner and the way [they are written] the burden of proof lies with the party asking you to do so as the law presumes the records to be accurate and complete as stated above.

The trial court declined to give the Millers' proposed instruction, stating, "I don't see this as a legal issue at all. I think it's a factual issue that you can argue."

On appeal, the Millers complain that the medical records were incomplete because they did not contain a "description of the procedures that [Phillips] testified she used in relieving the shoulder dystocia." Citing *Patrick v. Sedwick,* 391 P.2d 453 (Alaska 1964), and *Sweet v. Sisters of Providence in Washington,* 895 P.2d 484 (Alaska 1995), they renew their claim of entitlement to an instruction on Phillips's duty to maintain accurate and complete medical records, and they argue that the trial court erred in rejecting their proposed instruction.

We find this argument unpersuasive. Although the first paragraph of the Millers' proposed instruction accurately described

Phillips's duty to keep full and accurate notes, *see Patrick*, 391 P.2d at 457, the second paragraph's legal presumption of accuracy, with its burden-shifting provision, finds no precedent in our case law.

The authorities cited by the Millers do not support their requested presumption. In *Patrick*, the plaintiff, Patrick, awoke from thyroid surgery to find that her voice box had been permanently injured. *See id.* at 454. At trial, her surgeon had no recollection of the operation. *See id.* at 455. His surgery notes, which were made the day after the operation and were incomplete, did not refresh his recollection. *See id.* Because no other witnesses were capable of describing the operation, Patrick was unable to present affirmative evidence establishing her surgeon's negligence. *See id.* at 456. On these facts, *Patrick* held that the incomplete surgery notes could not be relied on to establish an absence of negligence. *See id.* at 457–58. The court concluded that proof of the unexplained injury constituted prima facie evidence of malpractice. *See id.* at 456.

*Patrick*'s core holding that the surgeon's incomplete notes could not be deemed accurate is entirely at odds with the Millers' proposed instruction, which required the jury to accept Phillips's allegedly incomplete notes as presumptively complete and accurate. In stark contrast to the situation in *Patrick*, the Millers' proposed instruction would have barred Phillips from relying fully on her actual recollections.

*Sweet* is equally inapposite. There we found that a hospital's negligent loss of surgical records justified a burden-shifting spoliation instruction as to causation. *See Sweet*, 895 P.2d at 491. However, we expressly based this conclusion on two uncontroverted factors: the hospital's negligence in losing the records and the plaintiffs' inability to establish a convincing prima facie case of causation without them. *See id.*

Here, in contrast to *Sweet*, there was no uncontroverted proof of lost or inadequate records. To the contrary, the adequacy and completeness of the medical records was a hotly disputed factual issue.[10] Nor did any alleged deficiencies in the delivery-room records hinder the Millers in presenting a prima facie case of malpractice. To the contrary, the purported deficiencies facilitated proof of the Millers' prima facie case by enabling them to attack Phillips's trial testimony as inconsistent with her notes and therefore incredible.

The instructions as a whole adequately informed the jury as to relevant law. *See Kavorkian v. Tommy's Elbow Room, Inc.*, 694 P.2d 160, 166 (Alaska 1985) (when reviewing a trial court's denial of a particular jury instruction, we consider whether the instructions as a whole adequately informed the jury of the relevant law). Given the disputed evidence concerning the completeness and accuracy of Phillips's delivery-room notes, we find no justification for a presumption reflecting the Millers' theory of their case. *See Clary v. Fifth Ave. Chrysler Ctr., Inc.*, 454 P.2d 244, 251 (Alaska 1969) (affirming trial court's rejection of proposed jury instruction that defined duty only as it related to plaintiff's benefit). The trial court properly left the issues of completeness and accuracy to the jury. The trial court's decision rejecting the proposed jury instruction did not amount to error.

### III. CONCLUSION

The trial court did not err in allowing Dr. Newton to testify as an expert witness and in

**10.** Phillips presented testimony from two experts who asserted that the notes made by Phillips and Nurse Leng were complete and allowed them to form opinions about the propriety of Phillips's actions. Carol Verga, a certified nurse midwife, testified that the medical documentation "taken in total between the [notes of] the nurse and the nurse midwife ... gives a very complete picture of what happened" regarding the shoulder dystocia incident. Dr. Jennett, an obstetrician/gynecologist, also testified that the standard of keeping accurate and complete records does not require that "every last thing that was part of a process" be noted. The Millers' expert, Dr. James Lundquist, admitted that Phillips's notes were sufficient to describe a case of mild shoulder dystocia, but that in his opinion Gage's shoulder dystocia was more severe than "mild dystocia" and that Phillips's notes were therefore not complete.

rejecting the Millers' proposed instruction presuming Phillips's notes to be complete and accurate. Furthermore, the court did not err, or it committed harmless error, in admitting evidence of Phillips's knowledge and experience and lack of prior panic. We AFFIRM.

EASTAUGH and FABE, JJ., not participating.