Lorenzo Christopher CARTER, Appellant,

v.

STATE of Alaska, Appellee.

No. A–10313.

Court of Appeals of Alaska.

June 18, 2010.

---

Sharon B. Barr, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant.

Tamara E. de Lucia, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Daniel S. Sullivan, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and BOLGER, Judges.

## OPINION

MANNHEIMER, Judge.

The question presented in this case is whether a police officer (called as a witness on behalf of the State) should have been allowed to testify concerning the physical indications that someone has been subjected to strangling. The argument against the admissibility of this testimony is that the officer was offering expert testimony but lacked the necessary qualifications to testify on these matters.

As explained more fully in our opinion, we conclude that the officer's testimony was proper. Some of the officer's challenged testimony was admissible as lay testimony under Evidence Rule 701 (that is, admissible without the need to show that the officer was an expert). And with regard to the other challenged portions of the officer's testimony, the trial judge could properly find that the officer had the requisite expertise to give this testimony. Accordingly, we uphold the judgement of the superior court.

1. AS 11.41.210(a)(2) and AS 11.56.745(a), re-

*Background facts*

On March 8, 2006, Romanda Lee contacted the police and reported that her then boyfriend, Lorenzo Carter, had assaulted her by grabbing the back of her head, hitting her, and choking her. Lee's two daughters told the police that they had witnessed the assault. Based on this incident, Carter was charged with second-degree assault (as well as interfering with a report of domestic violence, for unplugging Lee's telephone when she initially tried to call 911).[1]

However, at Carter's trial, Lee denied that Carter had assaulted her. Lee testified that she and Carter had argued, that they had accused each other of infidelity, and that Lee became so angry that she told her daughters to call 911 and falsely accuse Carter of assault. Lee further testified that, when the police arrived, she repeated her false story of assault because she was afraid that she would be in trouble for lying to the 911 operator.

Lee's daughters testified that they did not witness any argument between their mother and Carter, and they did not remember any assault.

In the face of these recantations, the State relied on the prior statements made by Lee and her daughters, as well as the testimony of the Anchorage police officers who responded to the scene. This appeal concerns the testimony given by one of these officers, Earl Ernest, concerning the signs of strangulation that he observed when he contacted Lee.

Before Officer Ernest took the stand, Carter's attorney asked the trial judge to bar the prosecutor from questioning any of the police officers "about [the] signs and symptoms of strangulation". The defense attorney asserted that this would be expert testimony that the officers were not qualified to give:

> *Defense Attorney:* I don't think any of the officers are qualified to give [this] kind of testimony. ... [T]he experts that the State typically [presents are] nurses with various degrees and training specifically in this area, and case histories to back them up. The officers don't have this kind of

spectively.

experience or training. They don't know alternate signs and symptoms. And I would ask that [the officers] just stick to what they observed.

The prosecutor responded that he only wanted the officers to testify (1) that they were trained to look for certain physical manifestations when they investigated a report that someone had been strangled; and (2) that they observed some of these manifestations when they interviewed Romanda Lee. The prosecutor declared that he did not intend to ask the officers to offer an opinion (based on their observations) as to whether Lee had been strangled.

When the trial judge (Superior Court Judge Philip R. Volland) asked the defense attorney if this limitation satisfied his concerns, the defense attorney responded that it did not. The defense attorney told the trial judge that, while he did not object to having the officers describe their observations of Lee, he did object to the proposed testimony concerning what the officers were trained to look for when they investigated a report of strangling. The defense attorney argued that this testimony would "essentially ... allow [the officers] to testify as experts [under] the guise of just talking about their training".

Judge Volland reserved his ruling on this point until he had a chance to hear the foundational testimony concerning the officers' training.

The next day, the prosecutor called Officer Ernest to the stand. Ernest testified that he had received training in the investigation of domestic violence, both at the police academy and in later training sessions during his twelve years with the Anchorage Police Department. Ernest also testified that he had received training specifically focused on the investigation of stranglings. When the prosecutor asked Ernest how many cases of domestic violence he had investigated during his police career, Ernest answered "thousands".

The prosecutor then asked Ernest to describe "[the] things ... to look for" when investigating a reported strangling. The de-

fense attorney did not object to this question. The following colloquy then ensued:

*Ernest:* [T]he evidence that would probably be present in a strangulation ... are [such things as] bruising, petechiae, raspy voice, or difficulty swallowing. There may be defensive wounds....

. . .

*Prosecutor:* Let me ... talk to you [about] specifics. You [said that] one of the things you all look for is bruising. What sort of bruising? ...

*Ernest:* Well, in a strangulation case, the primary place to look for bruising is going to be the neck area.

*Prosecutor:* ... In your twelve years as a patrol officer, ... [d]id you ever respond [to] and investigate any strangulation cases ...?

. . .

*Ernest:* Probably, in my career, in the 30's [or] 40's ... for the number of times I've investigated strangulation.

*Prosecutor:* All right. And ... how frequently do you see bruising in [strangulation] cases ...?

*Ernest:* Well, ... not as often as you would think. The fairer the skin, the more likelihood that you'll be able to see red marks, at least. Bruising tends to show up a little bit later, depending on how long it's been since ...

At this point, the defense attorney objected. The defense attorney told Judge Volland that the officer was now embarking on the kind of testimony that the defense attorney previously objected to—in particular, "the mechanisms of bruising, [and the] conclusions [the officer] would draw from [the presence or absence of] bruising".

Judge Volland overruled this objection. The judge noted that, according to Ernest's foundational testimony, the officer had responded to several dozen strangulation cases. Based on this, Judge Volland concluded that Ernest had sufficient experience "to talk about when he sees bruising and when he doesn't" in the context of strangulation investigations. Judge Volland further concluded that, to the extent the defense attorney had raised questions regarding the quantity or

quality of Ernest's experience, these matters went to the weight of Ernest's testimony rather than its admissibility.

After Judge Volland overruled the defense attorney's objection to Ernest's testimony about bruising, Ernest testified (without further objection) that, when investigating a case of strangulation, one would often see "red marks or scratches in the area of the throat" as well as "petechiae", which Ernest described as "a star-burst of red dots" created by "the bursting of blood vessels within the eyeball ... [or] sometimes in the fairer part of a person's skin, like around the eye or behind the ear". Ernest also testified that one would look to see whether the victim had a raspy voice, or was experiencing difficulty in swallowing, and whether there were defensive wounds on the victim's body.

The prosecutor then asked Ernest to describe Romanda Lee's physical condition at the time of the reported assault. Ernest testified that Lee had blood on her forehead (from an injury to her forehead), petechiae in both of her eyes, and fresh scratch marks on her neck and lower face.

At the conclusion of Carter's trial, when the prosecutor delivered his summation to the jury, he argued that Lee's physical injuries—in particular, the fresh scratches on her neck and face, and the petechiae in her eyes—corroborated the truthfulness of her initial statements to the 911 operator and to the police. In other words, the prosecutor argued that the presence of these physical injuries corroborated the State's allegation that Lee was strangled.

*Carter's contention that portions of Ernest's testimony were inadmissible expert testimony*

On appeal, Carter acknowledges that Officer Ernest could properly testify concerning his observations of Lee's physical condition—for example, the fresh scratches to her neck and face, and the petechiae in her eyes. But Carter contends that it was improper to allow Ernest to testify concerning the *significance* of these observations—that these were some of the signs or symptoms he was trained to look for as part of any investigation into a potential strangling.

Carter argues that, even though it might be true that police officers are trained to look for these things when they investigate a strangling, *telling* a jury that the police are trained to look for petechiae, or for fresh scratches on the neck or face, is tantamount to telling the jury that these things are, indeed, signs or symptoms of a strangling. Carter further argues that Officer Ernest did not have the requisite expertise to offer an opinion as to whether petechiae or fresh scratches are truly symptomatic of a strangling.

The State responds that Ernest's testimony was not expert testimony, but rather lay testimony—simply a description of his own observations of Lee's physical condition, coupled with a description of the training he received as a police officer. The State points out that the prosecutor at Carter's trial never asked Ernest to offer an opinion as to whether Lee's physical condition was consistent with her report of being strangled, or tended to show that her report of being strangled was truthful.

But even though the prosecutor may never have asked such questions of the officer, the officer's testimony implicitly rested on the premise that the things he had been trained to look for were, in fact, signs or symptoms of a strangling. Without this foundational premise, Ernest's testimony about his training would have had no relevance.

Indeed, as we have already explained, the prosecutor explicitly relied on this premise in his summation to the jury. The prosecutor openly argued that the fresh scratches and the petechiae were signs or symptoms that Lee had been strangled—and, thus, the presence of these injuries corroborated the State's allegation that Carter strangled Lee.

The real questions presented here are (1) whether the prosecutor's premise was the type of assertion that needed to be supported by expert testimony; and (2) if so, whether Ernest had the requisite expertise to offer that testimony.

*"Lay" testimony versus "expert" testimony*

The distinction between "lay" testimony and "expert" testimony is set forth in Alaska

Evidence Rules 701 and 702. The relevant portion of Evidence Rule 701 states that if a witness is not testifying as an expert, "the witness's testimony ... is limited to those opinions [and] inferences which are ... rationally based on the perception of the witness". The relevant portion of Evidence Rule 702 states that if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue," then a witness who is "qualified as an expert by knowledge, skill, experience, training, or education" may testify about this specialized knowledge and, based on this specialized knowledge, may render an opinion concerning the matter.

One bedeviling aspect of the relationship between Rules 701 and 702 is that, for many witnesses, both rules apply to their testimony.

For example, emergency room physicians and nurses might physically examine an arriving patient and then attempt to diagnose the patient's injury or illness. As the Alaska Supreme Court has noted, these doctors' and nurses' testimony concerning their personal observations of a patient's physical condition (*e.g.*, shortness of breath, dilated pupils, etc.) is *lay* or "fact" testimony: it is the witnesses' account of their own personal observation of events or circumstances.[2]

On the other hand, these doctors and nurses move into the realm of expert testimony when they testify about *why* they were looking for particular symptoms (or the absence of particular symptoms), or *why* they concluded that particular observations were important in reaching their diagnosis. On these topics, the testimony is covered by Rule 702—because the doctors and nurses are relying on "scientific, technical, or other specialized knowledge".

Seemingly, this latter testimony falls within Rule 701 as well, because the testimony consists of "opinions [and] inferences which are ... rationally based on the perception of

the witness". But this testimony is treated as "expert" testimony because, even though the diagnosis may be rationally based on the doctor's or nurse's personal perception of the patient's physical condition, the chain of inference that the doctor or nurse has relied on (when reaching this diagnosis) rests on specialized medical knowledge that is likely not shared by the trier of fact. In other words, this testimony is "expert" testimony because, in order for the jurors to understand or assess whether the diagnosis is rationally based on the doctor's or nurse's observations of the patient, the jurors must be given background information about facts and principles that are generally known only to members of the medical profession.[3]

Compare *Callahan v. State*, 769 P.2d 444 (Alaska App.1989), a case in which the defendant was convicted of refusing to take a breath test following his arrest for driving while intoxicated. This Court held that the trial court committed error when it prevented the defendant from presenting a witness who would have testified that the defendant had recently suffered injuries to his chest, back, and ribs—injuries that might have interfered with his ability to blow into the Intoximeter tube. *Id.* at 446–47.

The trial court excluded this proposed testimony on the ground that the witness was not medically trained, but this Court held that the witness's testimony was admissible as lay opinion under Evidence Rule 701. *Id.* at 446. Although we did not expressly say this, it appears that the underlying rationale of our ruling was (1) that Callahan's injuries were the type of injuries that a lay person could observe and understand, and (2) ordinary jurors were capable of understanding the relationship between Callahan's injuries (as described by the witness) and Callahan's potentially diminished ability to blow into the breath-test machine. Because specialized medical knowledge was not needed to understand these matters, the witness should have been allowed to testify.

**2.** *See Getchell v. Lodge,* 65 P.3d 50, 56 (Alaska 2003); *Miller v. Phillips,* 959 P.2d 1247, 1250 (Alaska 1998).

**3.** See the discussion of this point in Stephen A. Saltzburg, Michael M. Martin, and Daniel J. Ca-

pra, *Federal Rules of Evidence Manual* (9th ed. 2006), Vol. 3, pp. 701–11 through 701–18 (discussing the scope of Federal Evidence Rule 701), and pp. 702–8 through 702–11 (discussing the scope of Federal Evidence Rule 702).

*The testimony at issue in this case*

In this appeal, Carter claims that Ernest was improperly allowed to give expert opinion on three subjects: (1) Ernest's testimony that the fresh scratches on Lee's neck and lower face were indications that she had been strangled; (2) his testimony that the petechiae in Lee's eyeballs were also an indication that strangulation had occurred; and (3) his testimony that, often, the victim of a strangling will not exhibit bruising until later.

■ With regard to the first aspect of Ernest's testimony (the significance of the fresh scratches on Lee's neck and face), this was lay opinion. The jurors did not need specialized training or experience to understand the basis for this inference.

■ With regard to the second aspect of Ernest's testimony (the significance of the fact that Lee exhibited petechiae), we agree with Carter that this was expert testimony. Most jurors would likely not be aware of the tie between petechiae and strangulation; in other words, it would require "scientific, technical, or other specialized knowledge" to understand the significance of this observation in the context of an investigation into a reported strangling.

However, Judge Volland concluded (based on Ernest's foundational testimony) that Ernest had sufficient experience investigating cases of strangling to be aware of the connection between petechiae and strangulation, and thus to offer an opinion that the presence of petechiae was an indication that a strangling had occurred. Based on our review of the record, we conclude that Judge Volland's ruling on Ernest's level of expertise was reasonable, and not an abuse of discretion.

■ As this Court has previously observed, "[t]here is no requirement that a witness possess a particular license or academic degree ... to qualify as an expert. The criterion ... is whether the fact-finder can receive appreciable help from that [witness]."[4] Officer Ernest may not have had the expertise to offer a meaningful opinion on the precise physiological mechanism that causes petechiae, and he may not have been aware of all the potential alternate causes of petechiae. But Judge Volland found that Ernest had sufficient experience in criminal investigations to be aware that strangling victims often exhibit petechiae. Thus, Ernest could validly offer an opinion that the presence of petechiae tended to corroborate Lee's initial report that she had been strangled.

As we explained earlier, Ernest himself did not explicitly offer this opinion. But his testimony concerning his training—in particular, the fact that he was trained to look for petechiae when investigating a reported strangling—implicitly relied on the assertion that petechiae are an indication of strangling. And the prosecutor expressly relied on this assertion when he discussed the evidence of petechiae during his summation to the jury. Because the trial judge found that Ernest had the requisite experience to draw this connection between petechiae and strangulation, it was not error for the prosecutor to rely on this inference, nor was it error for Ernest to tell the jury about this aspect of his training.

For much the same reasons, we conclude that it was not error for Ernest to testify that strangling victims often will not exhibit bruising until later. Again, Judge Volland found that Ernest had sufficient experience investigating cases of strangling to be aware of this fact; and we conclude, based on our review of the record, that Judge Volland's ruling on this question was reasonable, and not an abuse of discretion.

*Conclusion*

The judgement of the superior court is AFFIRMED.

4. *Dymenstein v. State,* 720 P.2d 42, 45 (Alaska App.1986) (citations omitted).