NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| PAMIUQTUUQ C., | ) |
| | ) Supreme Court No. S-17677 |
| Appellant, | ) |
| | ) Superior Court Nos. 4FA-18-00046/ |
| v. | ) 00047/00048 CN (Consolidated) |
| | ) |
| STATE OF ALASKA, DEPARTMENT | ) MEMORANDUM OPINION |
| OF HEALTH & SOCIAL SERVICES, | ) AND JUDGMENT* |
| OFFICE OF CHILDREN'S SERVICES, | ) |
| | ) No. 1803 – November 25, 2020 |
| Appellee. | ) |
| | ) |
| | ) |
| ALBERT J., | ) Supreme Court No. S-17728 |
| | ) |
| Appellant, | ) Superior Court Nos. 4FA-18-00046/ |
| | ) 00047/00048 CN (Consolidated) |
| v. | ) |
| | ) |
| STATE OF ALASKA, DEPARTMENT | ) |
| OF HEALTH & SOCIAL SERVICES, | ) |
| OFFICE OF CHILDREN'S SERVICES, | ) |
| | ) |
| Appellee. | ) |
| | ) |

Appeals from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Michael P. McConahy, Judge.

---

\*      Entered under Alaska Appellate Rule 214.

Appearances: Courtney Lewis, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for Appellant Pamiuqtuuq C. Elizabeth W. Fleming, Kodiak, for Appellant Alfred J. Laura E. Wolff, Assistant Attorney General, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for Appellee. Nikole V. Schick, Assistant Public Advocate, Fairbanks, and James Stinson, Public Advocate, Anchorage, for Guardian Ad Litem.

Before: Bolger, Chief Justice, Winfree, Maassen, and Carney, Justices. [Borghesan, Justice, not participating.]

1. These consolidated appeals arise from the superior court's orders terminating parental rights to three Indian children.[1] The appeals focus on the court's denial of the parents' motions to continue the termination trial and on related admissions of expert witness testimony. We therefore do not need to describe the earlier course of the child in need of aid (CINA) proceedings.

2. The Office of Children's Services (OCS) petitioned to terminate the parents' rights in June 2019, asserting that the children were in need of aid on grounds of physical harm, mental injury, parental neglect, and parental substance abuse.[2] The

---

[1] The Indian Child Welfare Act (ICWA), 25 U.S.C. §§ 1901-1963 (2018), establishes "minimum Federal standards for the removal of Indian children from their families and [for] the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture." 25 U.S.C. § 1902. An "Indian child" is defined as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4).

[2] AS 47.10.011 provides, in pertinent part:

[T]he court may find a child to be a child in need of aid if it finds . . . that the child has been subjected to any of the following:

(continued...)

superior court's pretrial order scheduled October 14 for witness list and exhibit exchange; Wednesday, October 30, for a pretrial conference; and Monday, November 4, for trial.[3]

---

[2]      (...continued)

. . . .

(6) the child has suffered substantial physical harm, or there is a substantial risk that the child will suffer substantial physical harm, as a result of conduct by or conditions created by the child's parent, . . . or by the failure of the parent, . . .to supervise the child adequately;

. . . .

(8) conduct by or conditions created by the parent . . . have . . . resulted in mental injury to the child; or . . . placed the child at substantial risk of mental injury . . .

(9) conduct by or conditions created by the parent . . . have subjected the child or another child in the same household to neglect;

(10) the . . . ability to parent has been substantially impaired by the addictive or habitual use of an intoxicant, and the addictive or habitual use of the intoxicant has resulted in a substantial risk of harm to the child . . . .

[3]      Under ICWA and relevant Alaska CINA statutes and rules, parental rights to an Indian child may be terminated at trial only if OCS shows:

(1) by clear and convincing evidence that: (a) the child has been subjected to conduct or conditions enumerated in AS 47.10.011 (CINA Rule 18(c)(1)(A)); (b) the parent has not remedied the conduct or conditions that place the child at substantial risk of harm or has failed within a reasonable time to remedy the conduct or conditions so that the child would be at substantial risk of physical or mental injury if returned to the parent (CINA Rule 18(c)(1)(A)(i) - (ii)); (c) active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family (CINA Rule 18(c)(2)(B)); and

(continued...)

3.     On September 16 OCS gave notice that it intended to rely on certified business records reflecting relevant services provided to the parents and children. But by the October 14 deadline OCS had not filed or served a witness list. And by the October 30 pretrial conference OCS still had not filed or served a witness list or any information about potential expert witnesses for trial.[4] At the pretrial conference OCS asked for a trial continuance, informing the court that it had been "preparing for the cases that were first in the queue and this was not." The guardian ad litem and the mother's counsel objected; the father's counsel was not present. The superior court denied the requested continuance.

4.     Two days later, on Friday, November 1, OCS filed and served a witness list identifying seven expert witnesses and also served separate notices of its

---

[3]     (...continued)
(2) beyond a reasonable doubt, including qualified expert testimony, that continued custody of the child by the parent is likely to result in serious emotional or physical damage to the child (CINA Rule 18(c)(4)); and

(3) by a preponderance of the evidence that the terminating parental rights would serve the child's best interests (CINA Rule 18(c)(3)). *See* AS 47.10.011, 47.10.080(o), 47.10.088; 25 U.S.C. § 1912(d), (f).

[4]     CINA Rule 8(d) governs the identification and disclosure of expert witnesses the parties intend to have testify at trial and related information. Subsection 8(d)(1) provides that unless otherwise stipulated or ordered, a party must disclose the identity of retained experts (and of the party's employees whose duties include regularly providing expert witness testimony) and provide specific information about those experts, including resumes and written summaries of the substance of the experts' anticipated testimony, the experts' opinions, and the underlying basis for the experts' opinions. Subsection 8(d)(2) provides that "to call an expert witness who has had involvement with the family, but has not been retained solely for the purpose of providing an expert opinion, the party shall disclose to other parties the identity of that witness and shall provide any existing reports or written statements." Subsection 8(d)(3) provides that expert witness information "disclosures shall be made at the times and in the sequence directed by the court."

intent to have four of those witnesses testify at trial. OCS did not file the separate notices about the four expert witnesses until Monday, November 4, as trial was scheduled to begin. The four expert witnesses were: (1) a therapist for two of the children; (2) an individual who conducted a substance abuse assessment for the mother; (3) an individual who had conducted a behavioral assessment for the father (regarding domestic violence) and who had worked with the mother (on domestic violence awareness issues); and (4) an individual who provided psychotherapy for the mother.

5.      In an earlier adjudication hearing witness notice OCS had included an "ICWA expert" to testify about the prevailing social and cultural standards of the children's tribe and whether continued custody by the parents was likely to result in serious emotional or physical damage to the children.[5] OCS did not expressly identify an ICWA expert for the termination trial, although it stated in an expert witness notice that the therapist for two of the children would "testify concerning the likely serious emotional and/or physical damage to the child[ren] if custody were returned to the parents."

6.      On Monday, November 4 the parties convened for trial. The superior court queried whether everyone was "ready to go," and the mother's counsel said that

---

[5]      *See* CINA Rule 18(c)(4) (noting that, to terminate parental rights to Indian child, ICWA requires court to find "by evidence beyond a reasonable doubt, including the testimony of qualified expert witnesses, that continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child"); *see also* 25 C.F.R. § 23.121(c) (requiring "a causal relationship between the particular conditions in the home and the likelihood that continued custody of the child will result in serious emotional or physical damage to the particular child"); 25 C.F.R. § 23.122(a) ("A qualified expert witness must be qualified to testify regarding whether the child's continued custody by the parent . . . is likely to result in serious emotional or physical damage to the child and should be qualified to testify as to the prevailing social and cultural standards of the Indian child's [t]ribe.").

she was but due to other scheduled hearings she would not be able to begin trial until the next morning. OCS then advised the court about having served the witness list and expert witness notices the previous Friday. OCS indicated that it wanted to be certain the parents had notice of the expert witnesses and would not ask for a continuance the next morning. OCS also asserted that most of the relevant expert witness information had been disclosed earlier through discovery but that the parents had been provided information for the expert providing services related to domestic violence only the previous week. At that point the mother's counsel requested a continuance "in light of those expert notices which [she had not] had an opportunity to review," and the father's counsel concurred. Although noting that the witness whose information had been provided the previous week might be "problematic," the court denied the requested continuance, indicating that if the witnesses were testifying consistent with their reports and service records there should be little concern about late notice.

7. When court convened the next morning, the mother again requested a continuance due to the late expert witness disclosures. The superior court responded that generally a service provider can testify as a hybrid expert;[6] that absence of an

---

[6] We first addressed the concept of hybrid witnesses in a negligence suit against a midwife. *Miller ex rel. Miller v. Phillips*, 959 P.2d 1247 (Alaska 1998). In that case the midwife's supervising physician had been a defendant in the lawsuit and submitted affidavit testimony supporting pretrial motions; the midwife later called the physician to testify at trial. *Id.* at 1248-51. The midwife's witness list had identified the physician as a general witness but not as a potential expert witness. *Id.* at 1249-50. The trial court determined that the physician effectively was a treating physician and therefore could testify as a hybrid witness, stating that although the physician could not testify "in general terms about the appropriate standard of care, he would be allowed to testify as to 'his expert observations' and 'his own opinion as to what he observed.' " *Id.* at 1250. The trial court later expanded the allowable testimony to include matters discussed in the physician's affidavit, limited to the affidavit's four corners. *Id.* We

(continued...)

expert's resume or report is not a critical issue; and that "[w]hat really is going to be critical is whether somebody's been surprised." The court asked OCS to describe the expected scope of the expert witness testimony. The court then concluded it would allow the experts to "talk consistent with what their treatment or services provide," including "reasonable conclusions" drawn from those services "just as any of the hybrid witnesses could." But the court also concluded that "[t]o the extent that they're going to be offering expert opinions beyond . . . what they have provided as services," it likely would not "allow that to happen in the absence of an expert report." As the four hybrid witnesses testified, it became clear that OCS was attempting to use that testimony to meet

---

**6**     (...continued)

affirmed the trial court's rulings as within its discretion. *Id.* at 1250-51. We first stated that "[w]hen physicians are called to testify about . . . treatment of their patients, the distinction between an expert witness and a fact witness inevitably becomes blurred." *Id.* at 1250. We observed that other jurisdictions had "recognized that treating physicians need not be listed as expert witnesses on pretrial disclosure lists, even when their proposed testimony involves opinions regarding their patients' injuries, treatment, and prognoses." *Id.* We then rejected the plaintiffs' assertion of unfair surprise, noting that the physician had been on the witness list, the plaintiffs had the physician's affidavit testimony, and the plaintiffs had conducted a pretrial deposition of the physician after receiving the affidavit testimony. *Id.* at 1251.

We subsequently have reiterated that parties need not treat hybrid witnesses as retained expert witnesses in pretrial disclosures because, unlike retained expert witnesses, hybrid witnesses are not presumed to be under the retaining party's control. *See, e.g.*, *Thompson v. Cooper*, 290 P.3d 393, 400 (Alaska 2012) (first citing *Fletcher v. S. Peninsula Hosp.*, 71 P.3d 833, 844-45 (Alaska 2003); then citing *Miller*, 959 P.2d at 1250). We noted in *Fletcher* that, notwithstanding this rule, an opposing party still is entitled to discovery into a treating physician's potential expert witness testimony and that trial courts should take appropriate steps to avoid prejudice. 71 P.3d at 845.

its ICWA evidentiary burden about potential harm to the children if they were returned to their parents' custody.[7]

8.    OCS first called the mother's psychotherapist to testify. The mother objected on the basis of the late notice. The superior court rejected the objection, stating "that if an expert is giving testimony and including an opinion which is partially based on personal observations and partially based on experience, that witness may be permitted to testify without a formal expert report so long as the adverse party is not unduly surprised." OCS sought to have the psychotherapist qualified as an expert in both psychotherapy and child welfare, including "parental risk" of harm to children. The court sustained an objection to questioning about parental risk and required OCS to limit its questioning to the psychotherapy services provided to the mother.

9.    OCS next called the therapist who had provided services to two of the children. The mother again unsuccessfully objected based on late notice. After some voir dire, both parents objected to qualifying the therapist as an expert because he was unlicensed; the court overruled the objection. The mother then objected to qualifying the therapist as an ICWA expert, contending that a witness "must have more than just a social worker background in order to be a qualified expert witness under . . . ICWA." The court responded that the ICWA expert question "isn't before me" and invited OCS to "ask him some questions." Contrary to OCS's expert witness notice, the therapist did not testify that returning the children to the parents' custody presented a risk of serious emotional or physical damage to the children.

10.    OCS next called the domestic violence service provider who had assessed the father and worked with the mother on awareness issues. The late-served expert witness notice indicated that the witness would testify only "to the [b]ehavioral

---

[7]    *See supra* note 5.

[a]ssessment regarding [the father] . . . and concerning [the mother's] participation in the [program] . . . . She will explain the conclusions in the report, the analysis that led her to those conclusions, and the underlying scientific basis." OCS nonetheless sought to qualify this witness as an expert in child abuse and domestic violence. Both parents objected to qualifying the witness as an expert in child abuse. The superior court overruled the objections, permitting testimony about "child abuse issues to the extent that it's been in a report and [the father is] aware of it" but prohibiting "general over-arching views on child abuse." The witness then testified extensively about the father's risk to the children, stating that his "domestic violence and substance abuse would role model that lifestyle" and that "children living in those environments have an increased risk of mental health issues including depression[] [and] anxiety," "have difficulty . . . forming close relationships," have difficulty with emotional regulation, and "sometimes end up doing things that are self-harming or high-risk behaviors as a coping mechanism."

Following the witness's lengthy monologue about risks to children whose parents have substance abuse issues, the mother objected that the witness was "going on about . . . her general understanding of what child trauma is." The superior court stated that it would not let the witness "just give . . . general views of how any specific hypothetical condition may impact children" but concluded that the testimony had involved only a "specific exception" for the father, why he should get certain treatment, and the impact of the conditions in the home that were the basis of her recommendation. After the court overruled this latest objection, OCS's questions regarding risk of harm became more pointed. OCS asked, for example, whether it was the witness's opinion "through this assessment that children in this home would be at risk for serious emotional harm as a result of . . . domestic violence?" The mother objected on the ground that OCS was "asking for an expert opinion," but the court simply stated that the witness "already gave an opinion on that" without addressing the question's propriety.

11. OCS's final expert witness was the provider who conducted a substance abuse assessment for the mother. Both parents objected to her qualification as an expert on grounds that notice was filed late, that a resume was not provided until the day of her testimony, and that she was not sufficiently qualified because she was unlicensed and had been a practicing counselor for only three years. The court overruled the objections, concluding that the provider was "qualified to give the assessment or to give her comments based on" her assessment. The witness testified that the mother had minimized her alcohol use and that she needed "a good support system" and "to be at a good place for herself in order to be present and safe for her children." OCS asked "what risk was posed if [the mother] did not do the treatment for substance abuse?" Both parents objected to this question, and the mother noted that it was "not even . . . remotely part of her assessment." The court overruled the objections. OCS then restated the question as: "What . . . risk is there for [the mother] *and her family* if she did not receive such treatment?" (Emphasis added.) The witness testified that there would be "continued exposure to substance use in the home whether it's herself or others around her" and that "domestic violence" stemming from substance abuse "would impact her mental health, her ability to stay safe and make good, sound choices for herself and her family." A few questions later OCS asked: "[B]ased on the assessment if there were children in [the] home, would there be danger?" The court sustained the parents' objections to this question.

12. The mother asserted in written closing arguments that OCS "failed to present the expert testimony necessary for the termination of parental rights." She argued that each expert was "late-noticed"; that not one of the four experts was "qualified to discuss the likelihood of substantial harm to the children if they were to be returned home to the parents"; and that "*no witness was able to articulate the specific harm that the children may be exposed to upon return to the parents' care, or a nexus*

*between the existence of conditions and that harm (as is required under ICWA)."* (Emphasis in original.) Quoting our case law, the father asserted in written closing arguments that OCS also violated ICWA's requirements by failing to provide an expert to testify about the "prevailing social and cultural standards of the Indian child's Tribe."[8]

13. The superior court made oral findings on the record in mid-December. It first found that both parents had sufficient notice of the termination hearing under CINA Rule 3 as well as under ICWA and its regulations.[9] The court did not address the expert witness notice objections the parents presented at trial and in closing.

The court found that the children were in need of aid on the grounds of physical injury, mental injury, and parental substance abuse, but rejected the ground of parental neglect.[10] The court discussed the four experts' testimony. The court found the

---

[8] *Oliver N. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 444 P.3d 171, 174 (Alaska 2019) (quoting 25 C.F.R. § 23.122(a)).

[9] *See* CINA Rule 3 (listing requirements for notice and participation in CINA proceedings); 25 U.S.C. §§ 1901-1963 (establishing additional requirements for proceedings involving Indian children).

[10] *See supra* note 2. With respect to the ground of mental injury to the children, while this matter was on appeal we issued a decision discussing the necessity of a court-qualified expert witness testifying to the existence and cause of the mental injury. *See Cora G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 461 P.3d 1265, 1284-85 (Alaska 2020) (following Montana Supreme Court case involving ICWA expert, we concluded that "it is legal error for a trial court not to expressly qualify an expert witness to testify about a child's mental injury under AS 47.10.011(8)(A) and AS 47.17.290(10)"); *id.* at 1287-88 ("Without appropriate qualified expert witness opinion testimony explaining [the child's] alleged mental injury and the reasons for it, we are unable to conclude that the superior court's finding that [the child] had a mental injury caused by parental conduct or conditions . . . is sound. . . . We thus are unable to conclude that the superior court properly found, by clear and

(continued...)

mother's psychotherapist had testified that the mother was cooperative in therapy, that she had made "significant improvement" in the month leading up to trial, but that she "still does not realize the effect of substance abuse on the family." The court also found the two children's therapist credible, referencing his testimony about the older boy's desire to live apart from his mother and the younger brother's "lack of trust in his parents." The court accepted the domestic violence services provider as an expert regarding the risk assessment she prepared for the father. The court noted testimony that the father "admitted to using violence against [the mother]" and that the provider "was not able to make progress with [the mother]." The court appeared to find the mother's substance abuse assessor's testimony especially compelling, noting testimony that the mother "is still minimizing the [domestic violence] and substance abuse issues" and "that due to mental health and substance abuse issues, the home would not be a safe place" for the children.

The court found that "[p]hysical, mental harm, and substance abuse are not cultural norms in any society" and that an ICWA expert was not required to testify specifically to cultural or tribal norms. The court found that the experts' testimony supported the finding that OCS met its burden of proving, beyond a reasonable doubt, that "there is a causal connection between the behavior of the parents and the harm to the children."

14. The superior court later issued written orders terminating each parent's parental rights. The court stated that "[OCS] proved beyond a reasonable doubt, including an offer of testimony of a qualified expert witness, that return of the children

---

**10** (...continued)
convincing evidence, that 'conduct by or conditions created by the parent . . . resulted in mental injury' to [the child]." (fifth alteration in original) (quoting AS 47.10.011(8)(A))).

to [each parent's] custody is likely to result in serious emotional and/or physical damage to the children." The court did not explain what the "offer of testimony of a qualified expert witness" was or whom the court had considered a qualified expert witness under ICWA; OCS had not asked the court to qualify an expert to meet either the CINA evidentiary burden to show the children's asserted mental injuries and their causes or the ICWA evidentiary burden to show that returning the children to the parents was likely to result in serious physical or emotional harm to the children.[11]

15. The parents appealed their termination orders, and we consolidated the appeals. We address only arguments regarding the superior court's discretionary denial of their requested continuance and its allowance of the expert witness testimony.[12]

16. We conclude that it was either an abuse of discretion to deny the parents' requested continuance of the termination trial when OCS filed and served its witness list and expert witness notices one business day before trial, or an abuse of discretion (or legal error) to allow three of the hybrid witnesses to testify beyond the scope of the services they provided and to render opinions about the children when they did not provide the children services. It is not enough to say that because the expert witnesses were hybrid witnesses the late notice caused no surprise or prejudice, especially when the court later expanded the scope of the hybrid witness testimony

---

[11]    *See supra* notes 3, 5, & 10.

[12]    We review the denial of a continuance request for abuse of discretion, "considering the particular circumstances to determine whether a party was 'deprived of a substantial right or seriously prejudiced' by the superior court's ruling." *Kailyn S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 420 P.3d 1232, 1233 (Alaska 2018) (quoting *Clementine F. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 375 P.3d 39, 43 (Alaska 2016)). We also apply the abuse of discretion standard to a superior court's decision to admit expert testimony. *Marron v. Stromstad*, 123 P.3d 992, 998 (Alaska 2005). When the decision to admit expert testimony turns on a question of law, however, we apply a de novo standard. *Id.*

beyond a description of the services rendered to the parents and children and opinions closely related to those services.[13] Conceivably, had the court actually limited the hybrid experts' testimony to the four corners of the records timely produced to the parents, there might not have been prejudice from denying the continuance. But that is not what happened. The trial transcript is clear that OCS sought and was permitted to expand the scope of the hybrid experts' testimony beyond the records of services they provided. The transcript also is clear that OCS offered no hybrid expert to testify as an expert about the existence or cause of the children's alleged mental injuries or about whether returning the children to the parents' custody likely would cause the children serious physical or emotional harm.[14] And the transcript is clear that the superior court never qualified any hybrid expert witness to testify to the existence and cause of the children's alleged mental injuries or to the likelihood of serious physical or emotional harm if the children were returned to their parents.[15]

17.    We vacate the termination orders and remand for a new trial.

---

[13]    *See supra* ¶¶ 10-11 (regarding domestic violence service provider opining about potential child abuse and mother's substance abuse assessor opining about risk to children from domestic violence).

[14]    *Cf. Cora G.*, 461 P.3d at 1285-88.

[15]    *Id.* (referring to qualification failure as legal error); *see also supra* ¶ 9 (regarding superior court's admonishment that ICWA expert qualification issue "isn't before me").